Filed 5/15/13  Christal H. v. Super. Ct. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTAL H., | B246191 |
| Petitioner, | (Los Angeles County Super. Ct. No. CK92090) |
| v. | (Timothy R. Saito, Judge) |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; application for a writ of mandate.  Writ denied.

Law Offices of Alex Iglesias, Steven Shenfeld, and Shataka Shores-Brookes for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Real Party in Interest.

**INTRODUCTION**

Following a review hearing conducted pursuant to Welfare and Institutions Code section 366.22,[1] the juvenile court ordered that a hearing be held on April 8, 2013, pursuant to section 366.26, to develop a permanent plan for the dependent minors Anthony H., Josiah H., and G. H. Their mother, Christal H., petitioned for a writ of mandate to compel the juvenile court to vacate its orders, contending the court did not have before it substantial evidence that she failed to make substantive progress in her case plan or that it would be detrimental to return the children to her care. Review by extraordinary writ is the remedy provided in section 366.26, subdivision (*l*) and rule 8.452, California Rules of Court. Real party in interest the Los Angeles County Department of Children and Family Services (DCFS) filed an answer to the petition. We deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

Three-year-old Josiah H. (born in Nov. 2007) was taken to Chino Valley Hospital by Christal H. (Mother) because his eye was swollen and he was vomiting blood. His left eye socket was found to be fractured. As a result, San Bernardino Children and Family Services (SBCFS) received a referral regarding the family. Also in the home were A.V. (eight years old), Anthony H. (six years old, born in Feb. 2005), J.V. (five years old), and G. H. (one year old, born in June 2009).[2] Mother and the children lived with Tony (Mother's boyfriend) and Tony's father. Mother told the social worker that Josiah and

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    A.V. and J.V. are not subjects of the present petition. While they were declared dependents along with their three half-siblings, the court ordered them placed with their father, Jorge V., with whom they remain.
     Daniel L., the alleged father of Josiah and G., is not a party to this petition. Agustin A., the biological father of Anthony, also is not a party to this petition.

Anthony were throwing a ball in their room and Josiah fell on the floor. When he began vomiting blood she took him to the hospital.

Anthony told the social worker that Josiah had fallen off of the bed while trying to catch a ball. However, Anthony said he had seen his brother's eye was swollen when he woke up that morning. Tony had been the first person to notice Josiah's eye was swollen. When Tony showed Mother Josiah's eye, she asked, "Would I get in trouble for this?"

While visiting the home, the social worker noticed that G. had bruising under both eyes, blood inside her lower lip, and two circular bruises on her lower cheeks. Anthony said G. had fallen. Mother said G. had fallen from a chair and hurt her lip, and that the bruises were caused by other children at day care. At another time Mother said some of the bruises were caused by the child hitting herself on a table and the bruises on her cheeks occurred because Mother squeezed her cheeks too hard. G. was examined and the doctor opined that the bruises around her eyes were not typical accidental bruises, and the bruises on her cheeks were often seen when a child's face was grabbed forcefully. As to Josiah, the doctor thought his injuries were suspicious but he could not confirm physical abuse had occurred.

The social worker spoke with A.V. and J.V. at their father's home. J.V. said Tony hit her when she got in trouble. She had seen Tony hit Anthony with a belt and submerge him in the pool as a form of punishment. She had also seen Mother submerge Anthony in the pool to punish him. Tony also "smack[ed] G. on the face" "really hard." Tony also hit Anthony and Josiah, and J.V. said she was afraid of him. Mother denied that the children were abused by anyone. She said Tony was a good man and she had never seen him abuse the children.

Several months before, a referral had been made alleging Tony had submerged Josiah in the pool to punish him. A.V. and J.V. confirmed that information when interviewed alone, but recanted in Mother's presence.

The children were detained. A.V. and J.V. were placed in their father's custody. Anthony and G. were placed with their maternal aunt, who lived with her mother and

3

grandfather (Mother's stepmother and the stepmother's father); Josiah remained hospitalized but would be placed in the same home upon his release.

SBCFS filed a section 300 petition regarding the five children on May 4, 2011. Therein, it alleged that Mother had a history of domestic violence[3] and that G. and Josiah sustained physical injuries while in Mother's care and custody. In addition, Mother's boyfriend had submerged Josiah's head into the pool as a form of punishment and Mother knew about the abuse but failed to protect him. SBCFS filed amended petitions adding that Mother had a history of substance abuse based on a referral made in 2006 when J.V. was born.

A.V., Anthony, and J.V. were interviewed and received medical examinations in June 2011. All three children disclosed physical abuse by both Mother and Tony and said they did not want to return to Mother's care for fear of being "smacked." The children agreed that A.V. and J.V. were not subjected to physical abuse but the other three children were. Anthony and A.V. were concerned about getting Mother into trouble but agreed that she needed help controlling her anger and learning to stop hitting them. Mother hit the children, sometimes with a belt, and gave Josiah a "wet head," meaning she put his head into water to punish him. Even when confronted with this information, Mother continued to deny any abuse had occurred. She stated, however, that she was willing to participate in the services recommended by SBCFS.

In August 2011, Mother submitted on the allegations in the amended petition and the social worker's reports. The court sustained the allegations and declared the children dependents of the court.

In a case plan update completed in June 2011, the services in which Mother was required to participate were stated as follows: (1) general counseling: "individual counseling regarding the [SBCFS] intervention, developing interpersonal skills, to decrease treatment resistance, develop communication skills, discuss benefits of therapy

---

[3]     Jorge V. said he had obtained a restraining order against Mother in 2004 because she had attacked him and had been arrested; Mother acknowledged there had been domestic violence.

4

services, develop problem solving skills, work on self-esteem, increase self-awareness, neglect and physical abuse of minors and working developing appropriate boundaries in relationships"; (2) anger management: "complete an anger management program and show completion certificate to the . . . social worker. . . . [D]evelop skills to recognize when she is getting angry and ways to deal with her ang[er] positively. Develop how her anger [a]ffects her children negatively"; (3) complete a 12-week parenting program; (4) random drug testing and if a positive screen was produced, complete a substance abuse treatment program. At the hearing on August 4, 2011, the court adopted the reunification plan as recommended by SBCFS. The juvenile court ordered monitored visitation for Mother a minimum of once per week with the children.

As of the February 6, 2012 status review report, Mother had not participated in services required by her case plan, although she visited regularly with the children. She continued to deny any abuse had occurred. In April 2012, Mother's stepmother stated in a letter to the court that Mother had not moved out of Tony's home and in fact she intended to marry him. During monitored visitations, Mother often called Tony and put G. on the telephone with him. In November 2011, Mother tried to demand of the caregivers that she be allowed to take the children to Tony's home for a weekend visit. She continued to deny to her family that Tony had done anything wrong and vowed not to leave him. Mother became outraged and said the children were lying whenever family members attempted to talk to her about the allegations of abuse. In February 2012, nine months after the children were removed from her custody, Mother enrolled in parenting classes and individual counseling.

The six-month review hearing (§ 366.21, subd. (e)) was held in April 2012. The court found Mother had made moderate progress in alleviating or mitigating the causes necessitating removal of the children from her custody, but that continued jurisdiction was required.

SBCFS reported in July 2012 for the 12-month review hearing (§ 366.21, subd. (f)) that Mother had completed a parenting education course on April 12, 2012, and continued to participate in counseling. She attended individual counseling sessions

regularly between February and May 2012, but had been inconsistent in participating after being transferred to a different therapist. She had participated in only two counseling sessions. The service provider recommended further counseling for her. Mother visited with the children consistently and acted appropriately during visits. Mother was no longer living with Tony; she had moved into her biological mother's home.

On July 5, 2012, the 12-month review hearing was held and the court found that Mother had made moderate progress toward alleviating or mitigating the problems leading to the children's detention. In light of Mother's move, the juvenile court ordered the case transferred to Los Angeles County. The case was accepted by the Los Angeles County Juvenile Court on July 31, 2012.

In a September 2012 interim review report, DCFS reported that Mother had completed a 10-week domestic violence awareness education class at House of Ruth in February 2012 and an eight-session parenting education course in April 2012. Mother had attended only two sessions of counseling since being transferred to a new therapist in May 2012. In June 2012, the counseling service provider advised the social worker that Mother needed to continue attending counseling to focus on improving her problem solving skills, improving boundary setting in relationships, and managing stress and anger; the provider requested an extension of 12 additional sessions. However, Mother had not continued with counseling. After the case was transferred, Mother met with a DCFS social worker on August 30, 2012, and received referrals for individual counseling and anger management. At the progress hearing on September 4, 2012, the court ordered DCFS to prepare an update on Mother's progress and to ensure Mother's visits took place three times per week for three hours per visit.

Mother told the social worker on September 26, 2012, that she had an intake appointment scheduled for October 2, 2012, for counseling services that would include assistance with anger management. Mother finally met with her new therapist on November 29 and December 6, 2012.

The children's caregivers reported that Mother's visits were inconsistent. She did not take full advantage of the three-hour, thrice weekly visits as she would often call to cancel.

Mother lived with her biological mother, who told the social worker she did not know if Mother still had a relationship with Tony. Anthony's biological father, Agustin A., reported to the social worker that Mother continued to have contact with Tony.

At the request of the caregivers, the children received psychological examinations in October 2012 to assess their need for therapy. The clinician reported that Josiah appeared withdrawn and displayed considerable anxiety due to the abuse he had endured. When asked where he wanted to live, Anthony said he wanted to live with his grandparents. He did not want to live with Mother because she was with Tony and because she lived with her mother, who was mean to him.

DCFS recommended that returning the three children to Mother's custody would create a substantial risk of detriment to their safety and well-being. Mother had not completed individual counseling and continued to deny that she had contact with Tony, described by DCFS as "the perpetrator."

At the 18-month review hearing (§ 366.22) held on December 10, 2012, Mother testified that she was enrolled in individual counseling and had had two sessions; she said they were working on "boundaries." Mother testified that the SBCFS social worker wanted her to address "anger issues," but her former therapist did not find that she had any anger issues, rather she thought that Mother needed to learn boundaries. Mother described anger as being "when you obviously don't know how to control your feelings and you just, you know, overreact. And boundaries are, basically, setting rules and not allowing things to happen and people to do things that are inappropriate." She said she had previously completed separate programs in anger management, parenting, and domestic violence. In the parenting class she learned how to discipline and understand her children and that each child was different and needed his or her own attention. In

7

domestic violence class she learned "not to put up with any . . . disrespect or hitting" and that "it's not healthy and appropriate for somebody to do that to another person."

Mother acknowledged that she had never been granted unmonitored visitation with her children. She said that she had not seen Tony since she moved out of his home in June 2012.

Counsel for DCFS pointed out that Mother had not provided proof that she had completed an anger management program. Counsel expressed concern that Mother had only recently been back in compliance with the individual counseling portion of her case plan, and that her visitation had been inconsistent. DCFS requested termination of reunification services. Counsel for the children acknowledged that Mother had made efforts, but counsel still had "significant concerns" about Mother's ability to care for the children. She noted that Anthony did not want to go back to Mother, and that he felt safe and comfortable with his current caregivers. The child said that despite what Mother had said, he believed that she was still in contact with Tony. The children's counsel said she was not sure Mother had learned what she needed to from either the domestic violence or parenting counseling. Mother never progressed beyond unmonitored visitation. Counsel agreed that reunification services should be terminated.

Mother's counsel argued that Mother did not realize that she could ask for liberalized visitation and instead DCFS should have provided it, although counsel acknowledged DCFS might be hesitant to do so with a case assigned to it for only a matter of months. Counsel pointed out that Mother's case was transferred to Los Angeles in late July 2012, but she was not assigned a social worker until September. Mother's counsel did not address the lack of proof that she had completed a separate anger management program. Rather, counsel asserted that the only issue was that Mother had not completed individual counseling but argued that she had nonetheless made substantial progress in her programs. Counsel requested that the court return the children to Mother's home because DCFS had not shown a risk of harm to the children if they were placed with her.

8

The juvenile court found that conditions continued to exist justifying jurisdiction and found that returning the children to the physical custody of Mother would create a substantial risk of detriment. Mother had been ordered to participate in programs that she still needed to complete, and the extent of progress she had made toward alleviating or mitigating the causes necessitating placement of the children had been only partial. Although Mother had made some progress in her classes, there had not been sufficient progress in individual counseling and there appeared to be issues that remained to be addressed. The court terminated family reunification services and scheduled a permanency planning hearing for April 8, 2013.

## DISCUSSION

Mother contends there was insufficient evidence to support the court's finding that she failed to make substantive progress in her case plan or that it would be detrimental to return the children to her care. We disagree.

Our review of the trial court's findings as to Mother's compliance with her case plan and as to detriment is governed by the substantial evidence test: the trial court's findings must be upheld if there is substantial evidence to support them. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762, 763.)

Section 366.22, subdivision (a) provides in relevant part that at the 18-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider

9

the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . . ; and shall make appropriate findings pursuant to subdivision (a) of Section 366."

The court had before it substantial evidence to conclude Mother had not sufficiently addressed her lack of parenting skills, her own physical abuse of the children, her anger management problems, or the harm caused to her children by her relationship with Tony. All of these things led to the removal of the three children, as well as the two oldest children who were placed in their father's custody.

There is substantial evidence that Mother did not fully comply with the court-ordered case plan. The sum total of her compliance (which did not begin until at least six months after the children were first detained) consisted of the following: (1) four months of weekly individual counseling in early 2012 with a counselor who did not feel Mother had anger issues, two additional sessions over the following few months, plus two sessions in the two weeks immediately preceding the 18-month review hearing in December 2012; (2) a 10-week domestic violence awareness course that she completed in February 2012; (3) and an eight-week parenting education course that she completed in April 2012.

The parenting class Mother took was only eight weeks long and she did not describe it as including education on avoiding physical abuse. The only substantive feedback from Mother's counseling provider indicated Mother had more work to do. Her first counselor did not address anger management with her despite the allegations that she had personally inflicted serious physical abuse on her young children. The domestic violence class was apparently for victims, while the record indicates that although Mother might have been victimized or controlled by Tony, she was primarily a perpetrator of abuse. Her former husband had obtained a restraining order against her, and two of her children stated that she got very angry and hit them more than Tony did. Her son Josiah had been hospitalized with a skull fracture (of his eye socket), the cause of which was

10

never adequately explained, and he continued to suffer from anxiety and withdrawal almost two years after being removed from Mother's custody. Mother claimed she had taken a separate anger management course but offered no proof or certificate of completion to support that assertion. Indeed, and most critically, she never once acknowledged that any physical abuse had occurred, let alone demonstrated that she had learned to control her anger and no longer posed a risk of harm to her young children.

In any event, in determining whether to return a child to parental custody, compliance with the reunification plan is not the sole concern of the court. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1140.) Even if Mother had fully complied with the case plan, the paramount issue remains whether return of the children to parental custody would be detrimental or pose a substantial risk of harm to them. As was stated in *Dustin R.*: "Mother's argument seems to suggest the mere completion of the technical requirements of the reunification plan—such as attending counseling sessions and visiting her children—is sufficient. Availing herself of the services provided is one consideration under section 366.22, subdivision (a), but under this statute the court must also consider progress the parent has made towards eliminating the conditions leading to the [child]'s placement out of home." (*Id.* at pp. 1141-1142.)

Mother did some work toward completing the requirements of the case plan, but clearly the underlying justifications for assuming jurisdiction over the children continued to exist at the time of the section 366.22 hearing. Mother had physically abused her children and never acknowledged that fact and never demonstrated that she had received effective guidance to avoid doing so in the future, and therefore the questions regarding the children's safety while in Mother's care remained unanswered. The court had before it substantial evidence that returning the children to Mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being.

## DISPOSITION

The petition for writ of mandate is denied.  The stay of the permanency planning hearing is dissolved.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.